## Case No. 12,770.

SHERMAN v. TRADERS' NAT. BANK.

[9 Biss. 216.] [1]

Circuit Court, N. D. Illinois. Dec., 1879.

BANKRUPTCY—SECURITIES FROM INSOLVENT DEBTOR—ASSETS—RECEIPT FOR UNDELIVERED GOODS—SECURITY ON PERSONAL PROPERTY.

1. Where a creditor obtains a security upon property, the debt being incurred and the security obtained in good faith, making the security available at a time when the creditor knows that the debtor is insolvent does not prevent the security operating to the benefit of the creditor.

2. And when in such case the security given the creditor was a receipt for coal, not separated, but remaining mingled with other coal in the yard of the debtor, and the creditor took possession of such coal, after discovering the insolvency of the debtor, but before the filing of the petition in bankruptcy, held, that the assignee in bankruptcy could not maintain a suit to recover the value of the coal.

3. Though the transaction was nothing more than security in the nature of a chattel mortgage on personal property remaining in the hands of the mortgagor for the benefit of the mortgagee, yet under the ruling of the supreme court it must be held, that the security can be maintained for the benefit of the creditor.

4. Clark v. Iselin. 21 Wall. [88 U. S.] 360, commented on.

[This was an action at law by Judson G. Sherman, assignee, against the Traders' National Bank.]

H. O. McDaid and C. A. Knight, for plaintiff.

E. G. Asay, for defendant.

DRUMMOND, Circuit Judge. This is an action by the assignee of John T. Cutting, a bankrupt, to recover from the defendant the value of a certain quantity of coal, alleged to have been the property of the bankrupt, and which was sold by the defendant and the proceeds received December 19, 1876. On November 27, 1876, the bankrupt borrowed of the defendant the sum of three thousand dollars and gave his promissory note

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

payable in thirty days after date. The note was payable to Mr. Rutter, the president of the bank, but there is no question that the money belonged to the bank, and the note was given to the president for its benefit. Accompanying the note was a warrant of attorney given at the same time by the bankrupt authorizing the confession of a judgment at any time after the date of the note. The bankrupt at that time was a coal merchant and had a yard at the foot of Huron street in Chicago; and to secure the note given at that time, the bankrupt gave to the bank a receipt signed by him in which he said that he had received in store at the yard at the foot of Huron street for account of Traders' National Bank of Chicago eight hundred tons of coal, subject to their order free of all charges. This seems to have been treated by the parties in the nature of a warehouse receipt, or an acknowledgment given by the bankrupt to the bank that he held so much coal for it, and of course, deliverable on request. The receipt spoke of two different kinds of coal, four hundred tons of chestnut Lackawanna coal, and four hundred tons of Briar Hill coal, but this coal does not appear to have been separate, but was mingled with other coal. The president of the bank on the 2d of December, a few days after the execution of the note and the delivery of the receipt, became alarmed, so he says, in consequence of some facts which he learned between that time and the date when the money was loaned, and he resolved to take possession of the coal named in the receipt, and gave a written order to a person to that effect to hold the coal for the bank; and possession was taken by him, and the coal, with the consent of the bankrupt, was sold from time to time at the market rate and the proceeds applied to the payment of the note. There was no delivery of the coal on the 27th of November except what might be implied from the receipt, and the bankrupt from that time to the 2d of December continued in his regular business of selling coal, and from both piles of coal in which was the property in controversy. He on the 2d of December agreed that the bank might take possession of the coal. At the time that these transactions took place the coal in the bankrupt's yard, including that in controversy, had only been partially paid for by the bankrupt, a large portion of it having been purchased of the coal dealers in this city and elsewhere.

There is no doubt but that the bankrupt was insolvent at the time the note was given and the property delivered; and on the 20th day of December, 1876, a petition in bankruptcy was filed against him, and on the 10th of January, 1877, he was duly adjudicated a bankrupt by the proper court. The president of the bank states that he believed Cutting was solvent at the time the note was executed and the money loaned. The bankrupt states that the bank never author-

ized him to sell the coal covered by the receipt, but that it knew that he was conducting a coal business at the time. But the bankrupt intended, in making the sales, as he says, always to reserve coal enough to meet the receipt that he had given to the bank.

Now the question is, whether under this state of facts, the assignee of the bank, the plaintiff herein, is entitled to recover the value of the coal. The difficulty in this case grows out of this fact: that the property at the time the receipt was given, which was in the nature of a security, and was not within the terms of the law strictly a warehouse receipt, was not delivered over to the bank, or to Mr. Rutter for the bank, but remained in the possession of the bankrupt, he being clothed thereby with all the indicia of ownership of the property. This may be called a chattel mortgage which was not recorded. It was nothing more, in other words, than security on personal property remaining in the possession of the mortgagor for the benefit of the mortgagee, and the question is, whether under such circumstances this security can be maintained for the benefit of the bank. My own opinion has always been that this cannot be done: that it was really under the circumstances of the case a mere security on personal property remaining in the possession of the mortgagor, and where he appears to all the world as the owner of the property; but I do not understand that such is the opinion of the supreme court of the United States. I have not been able to distinguish this case in principle from the case of Clark v. Iselin, 21 Wall. [88 U. S.] 360, which we have to encounter so often in deciding these cases. That was a case where a debtor gave a warrant of attorney to confess a judgment, and at the time it was supposed by the creditors that the party was solvent. In point of fact he was not solvent; and at the time the warrant of attorney was entered up and judgment obtained, the creditor knew that the debtor was insolvent and so it was a case of a warrant of attorney given and received in good faith, but entered up at the time when the creditor knew that the debtor was insolvent. I have never believed that ought to be permitted, but the supreme court has sustained it, and I do not know how in principle this case is different from that. This is not a warrant of attorney, but it is a case where at the time the debt was incurred, and the money loaned and security taken, it was in good faith on the part of the creditor, and, as he says, he had no suspicion at that time—and there is nothing to contradict his statement—that the debtor was insolvent. He obtained some intelligence between the date of the transaction and the time he took possession of the property which alarmed him, but I do not know that we can infer from his statements that that information was of a character to induce him to believe he was actually insolvent, but only there were circumstances which made him think that it was necessary for him to exercise the power with which the bank was clothed by the receipt, and take possession of the property. So that under the principle decided in the case of Clark v. Iselin [supra], inasmuch as the creditor took possession of the property with the consent of the bankrupt, it was actually delivered, because that is the legal effect of what was done. And it was sold by the custodian of the bank with the consent and knowledge of Cutting, and all of this was before the petition in bankruptcy was filed. I understand the principle established by the supreme court, though under a strong protest on the part of a minority of the court, to be this, namely: that where a creditor obtains a security upon property, the debt being incurred and the security obtained in good faith, the fact that the security is made available at a time when the creditor knows that the debtor is insolvent does not prevent the security from operating to the benefit of the creditor. And it seems to me I must hold that this security was available for the benefit of the bank and therefore that the assignee cannot recover the value of the property.

The property was sold for more than the amount of the debt. The plaintiff will be entitled to the difference between the amount received for the coal, which was $3,201.62, and the amount loaned on the 27th of November, $3,000 less the discount. I do not think I could allow any interest after they took possession of the property, so there would be really only five days' interest from the time that they took possession, which was on December 2d.